**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **Criminal No. PWG-20-262** |
| **JOHNNIE CURRIE,** | : | |
| **Defendant** | : | |

...oooOooo...

<u>**GOVERNMENT'S RESPONSE TO DEFENDANT'S**</u>
<u>**MOTION TO SUPPRESS STATEMENTS**</u>

The United States of America, by and through Jonathan F. Lenzner, United States Attorney for the District of Maryland, and Hollis Raphael Weisman, Assistant United States Attorney, submits the following response to the defendant's Motion to Suppress Statements.

The defendant's motion seeks suppression of statements he made to the police on both February 20, 2020 and February 21, 2020. All statements were voluntary, made when the defendant was not in custody, and admissible at trial in the government's case in chief.

***FACTS OF THE CASE***

The government expects the evidence to show that on February 9, 2020, the victim reported that she had been assaulted by the defendant, Johnnie Currie.   She told police that while she was a passenger in his car, driving in Maryland, she and the defendant got into an argument.   The defendant cut her left thigh with a box cutter and refused to let her call for assistance, passing Prince George's Hospital Center and eventually dropping her off at MedStar Washington Hospital Center in the District of Columbia.

District of Columbia police originally responded to the MedStar emergency room, where the defendant received 25 sutures to close the wound on her thigh.   Upon realizing the assault occurred in Maryland, the D.C. police contacted the Prince George's County Police, who arrived

1

at the hospital.   When the Prince George's County detective realized that the cutting occurred on the Baltimore-Washington Parkway, which is under federal jurisdiction, Park Police arrived to take over the investigation

During the next few weeks, Park Police spoke with the victim, obtained surveillance video and the victim's medical records, and confirmed that the assault with the box cutter occurred on the Baltimore-Washington Parkway.   They also checked the defendant's criminal records, identified his car where the cutting occurred, and determined whether the car was likely to be in Maryland or the District of Columbia.

Park Police concluded that the defendant's car would probably be in the District of Columbia.   On February 20, 2020, they obtained a Superior Court search warrant for the vehicle.

The detectives met the defendant for the first time at about 12:30 p.m. that day at his place of employment, showed him the search warrant, and explained that they wanted to conduct a search of the car.   Det. Pettett asked the defendant if he was aware of what happened on February 9, 2020.   Standing together, the defendant told Pettett, "No, I took someone to the hospital."   He then gave the police his name, cellphone number, and the keys to the Honda. Pettett told the defendant she would call him when the car was ready to be picked up.   Police then left.

The Honda was towed to the Park Police station a few blocks from the defendant's employment location.   Police conducted the search, and called the defendant about 4:30 p.m. to tell him the search was completed.   At about 6:50 p.m., the defendant arrived at the police station and picked up his car.   He agreed to meet with the detectives the following day, February 21, at the police station.

The only question the police asked him when the defendant picked up his car was whether he was willing to come to the police station the next day to be interviewed.   He agreed.

Pettett received a call the following morning from a man who identified himself as an attorney.   He did not say he was representing the defendant, but asked Pettett about the defendant.    Pettett explained that she was anticipating a voluntary interview, that the defendant could leave at any time, and that the defendant would not be arrested.   The caller used the term "target" to refer to the defendant, but Pettett never told him that the defendant was a target.

The defendant arrived at the police station on the evening of February 21, 2020.   Pettett escorted him into an interview room, where they were joined by Det. Turner.   The door to the interview room remained open.   The defendant was not restrained; he was simply sitting on a chair next to the desk where Pettett was sitting.    Turner was sitting on another chair.   The entire interview was video recorded.

At about 7:47 p.m., Pettett began the interview by telling the defendant, "So, I appreciate your coming in.   Like I said, once we're finished here, you're going to walk out the door." Pettett continued, "Basically, what I want to talk to you about is what happened on the ninth."

Pettett then let the defendant tell his story, interrupting to ask questions.   At no time did she tell the defendant that he was under arrest.   At no time did she handcuff or restrain him.   At no time did she close the door.   She did not advise the defendant of his *Miranda* rights because at no time was he placed in custody.   And at no time did the defendant indicate that he wanted to stop speaking or to leave.

The defendant's version of what happened on February 9 was basically exculpatory.   He acknowledged that the victim had a wound on her thigh, had no explanation for how she got the wound, but denied doing it.

3

At the end of the interview, at about 8:41 p.m.,   Pettett told the defendant she had no

further questions.   She said, "If something comes up, is it okay if I reach out to you and call you

on your cellphone?"   The defendant said yes.   As they got ready to leave the room,   Pettett told

the defendant, "Well, we'll grab your cellphone and I'll walk you outside, okay?"   They then

left the room.

**ARGUMENT**

**A.**      ***The defendant was not in custody, and* Miranda *warnings were therefore not required.***

The defendant has moved to suppress statements made to the police on February 20 and

February 21, 2020.   He alleges, first, a violation of *Miranda v. Arizona,* 384 U.S. 1121 (1983).

It is axiomatic that *Miranda* warnings are required for custodial interrogation.   *Miranda*

*v. Arizona*, 283 U.S. 326 (1966).   But the prerequisite is that the person be in custody.   The test

for determining whether someone is in custody is whether, under the totality of the

circumstances, his "freedom of action is curtailed to a degree associated with formal arrest."

*Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (Citation omitted.).   Questioning during a

routine traffic stop does not require the giving of *Miranda* warnings, because a person stopped

for a routine traffic offense is not deemed to be in custody, despite the fact that he is not free to

leave.   *United States v. Leshuk*, 65 F.3d 1105-09 (4th Cir. 1995).   In fact, the "perception that

one is not free to leave is insufficient to convert a *Terry* stop into an arrest."   *United States v.*

*Sinclair*, 983 F.2d 598, 601 (4th Cir. 1993).   Even the use of handcuffs does not convert an

encounter into a custodial arrest if the use of handcuffs is reasonably necessary to protect the

officer's safety.   *United States v. Hamlin*, 319 F.3d 666, 671 (4th Cir. 2003).

Moreover, "Custody determinations do not depend on the subjective views of either the

interrogating law enforcement officers or of the person being questioned, but depend instead the

objective circumstances of the interrogation."   *United States v. Parker,* 262 F.3d 415, 419 (4th

Cir. 2001) (Citation omitted.)

The defendant here was not placed in custody, nor the functional equivalent of custody, on either February 20 or February 21, 2020. "When deciding whether a defendant not under formal arrest was in custody—and thus if the *Miranda* requirements apply—a court asks whether under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest. " *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013). (Internal quotation marks and citation omitted.)   "Facts relevant to the custodial inquiry include, but are not limited to, the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant."   *Id.* at 283.

On February 20, the police officers spoke with the defendant at his place of business. They did not arrest him or tell him he was under arrest.   The one question asked, whether the defendant knew what happened on February 9, 2020, was not asked while the defendant was in custody, and therefore no custodial interrogation occurred.   Although the defendant has not articulated what "certain statements" from that day he is seeking to suppress (ECF30 at ¶¶ 2, 4), that is the only statement made by the defendant that day that the government is aware of.

On February 21, the defendant spoke with the police officers for slightly less than an hour at the police station.   Not only did the officers not tell the defendant that he was not under arrest, but Pettett explicitly told the defendant that he would be leaving the police station at the end of the interview.   No one placed handcuffs on the defendant.   No one displayed a weapon.   No physical contact occurred between the defendant and any police officer.   No one even closed the door to the interview room.   The tones of voice of the officers and the defendant were normal conversational tones.   It would be unreasonable to consider these circumstances custody or its

functional equivalent.

Because there was no custody, there was no custodial interrogation, and the police were not obligated to give the defendant any *Miranda* warnings.

**B.      The statements made by the defendant were voluntary.**

The defendant also alleges that his statement were "otherwise involuntary."   ECF30 at ¶ 6.   But at no time does he indicate what factors made his statements involuntary.

"The test for determining whether a statement is voluntary under the Due Process Clause is whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). (Alterations in original)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).   The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Braxton,* 112 F.3d at 780.

The defendant does not allege even a hint of what the police did to overbear the defendant's will.   They had a non-custodial conversation with him.   He gave them a story that exculpated him.   The result is a voluntary statement that is admissible in the government's case in chief at trial.

**CONCLUSION**

For the above reasons, the government submits that the defendant's voluntary statements were not custodial and therefore not subject to the requirements of *Miranda*.   The defendant's Motion to Suppress Statements should be denied.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney for the
 District of Maryland

_____

Hollis Raphael Weisman
Assistant United States Attorney
Bar No. 11465
United States Courthouse
6500 Cherrywood Lane, Room 400
Greenbelt, Maryland   20770
301-344-4029; 301-344-4516 (FAX)
Hollis.weisman@usdoj.gov